THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MARCUS LAMB,<br><br>Plaintiff,<br><br>v.<br><br>HEADCOUNT MANAGEMENT, INC.,<br><br>Defendant. | FINDINGS OF FACT<br>AND<br>CONCLUSIONS OF LAW<br><br>Case No. 1:19-cv-70<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Marcus Lamb sued Headcount Management, Inc., challenging the late start and early termination of his employment contract. Although Mr. Lamb initially asserted other claims as well, *see* Dkt. No. 8-1 (Verified Complaint), the only claims that he continues to press are claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation, and negligent misrepresentation, *see* Tr. at 15:11–16:10. Motions practice failed to resolve the case and the court held a two-day bench trial on March 10, 2022, and March 11, 2022, with closing arguments on June 27, 2022.

After careful consideration of the evidence and argument presented at trial and in the parties' pre- and post-trial briefing, the court enters the following findings of fact and conclusions of law. Based on these findings and conclusions, the court will enter judgment for Headcount on all of Mr. Lamb's remaining claims.

### FINDINGS OF FACT

**1.** Mr. Lamb is a citizen of Utah. *See* Dkt. No. 2 ¶ 6. He resided in Weber County when the events at issue in this case occurred. *See* Verified Complaint ¶ 1.

2. Headcount is a corporation that provides payroll and other services. *See* Tr. at 110:20–23. Headcount is incorporated in New York, and its principal place of business is in Connecticut. *See* Dkt. No. 4 ¶ 3.

3. On July 1, 2010, Headcount entered into a Master Services Agreement with GreenFoot Technologies. *See* Pl. Ex. 32.

4. Under the express terms of that agreement, Headcount "agree[d] to employ certain workers assigned by [GreenFoot] to provide services directly for/at customer companies of [GreenFoot]." *Id.* § 2.1. In turn, GreenFoot was obligated to "use its best efforts to successfully source, screen and otherwise identify candidates to satisfy the requirements of its customers." *Id.* § 3.2. The plain language of these provisions is consistent with testimony provided by Headcount's president, Mark Arrow, who testified that Headcount had "nothing to do with the actual finding of candidates," Tr. at 115:16–23, and GreenFoot's owner, Douglas Ott, who testified that "all of the contract employees" that the company "place[s] at . . . client sites are indeed actual employees of Headcount Management," *id.* at 31:15–17.

5. The Master Services Agreement further provided that once GreenFoot selected a candidate to provide services for one of its clients, Headcount would act "[a]s the employer of record for said workers." Pl. Ex. 32 § 2.1. In performing that function, Headcount was required to (1) "process payment, remit all required taxes (federal, state and local), and withhold any wage garnishments or other payroll deductions as required by law," *id.*; (2) "provide general liability, workers compensation, unemployment, and other required insurances" for the covered employees, *id.* § 2.2; and (3) "process all unemployment claims, workers compensation claims, year-end wage statements (W-2s), employment verifications and other employment related documents as required for workers employed by HEADCOUNT," *id.* § 2.3.

6. After a worker had been hired by Headcount and assigned by GreenFoot to provide services to one of GreenFoot's customers, Headcount was to "invoice customers directly for any services provided by [those] employees of Headcount, at the bill rate set" by GreenFoot. *Id.* § 4.1. When it received payment for those invoices, Headcount was then obligated to "deduct wages, taxes, fees, advances etc" at the rates set forth in the Agreement and pay GreenFoot "the balance of profits . . . in the form of a Recruiter Profit Check within five (5) business days of receipt of payment." *Id.*

7. The Agreement expressly stated that none of its provisions "shall be construed to establish or constitute that either party is an agent, employee, partner, joint venture or associate of the other," and that Headcount and GreenFoot entered the agreement "as Independent Contractors and do not intend any other relationship to be created by this Agreement." *Id.* § 1.1. It also included the following limiting language:

> [GreenFoot] shall not have the power, and shall not represent or imply that it has the power, to obligate HEADCOUNT to any expenses other than those expressly agreed to in writing by HEADCOUNT. [GreenFoot] shall notify workers that they shall not have the power, and shall not represent or imply that they have the power, to obligate HEADCOUNT to any expenses other than those expressly agreed to in writing by HEADCOUNT.

*Id.* § 1.2.

8. The Idaho National Laboratory, which the parties refer to as INL, is located in Idaho Falls, Idaho. It is run by the United States Department of Energy and is "the nation's leading center for nuclear energy research and development." ABOUT IDAHO NATIONAL LABORATORY, https://inl.gov/about-inl (last visited July 29, 2022).

9. Around January 18, 2018, GreenFoot became aware of an opportunity to place an individual as a contractor at INL. Mr. Ott testified that he learned of the opportunity through a phone call from Jim Lively, a manager at INL. *See* Tr. 40:2–14.

10. At that time GreenFoot had two employees: Mr. Ott and Jay McKnight. *See id.* at 31:1–5. Mr. Ott testified that Mr. McKnight's job was to be the "point of contact for all of the contractors." *Id.* at 57:18–20.

11. On January 18, 2018, Mr. McKnight sent Mr. Lamb a direct message through LinkedIn informing him of "a client in [his] area" that was "looking to fill a position of JIRA Administrator." Pl. Ex. 1. Mr. Ott testified that at that point, Mr. McKnight began acting as GreenFoot's "contact for Mr. Lamb." Tr. at 57:8–10.

12. Mr. Lamb testified that he discussed the position with Mr. McKnight by telephone shortly thereafter. *See id.* at 156:2–12. Mr. Lamb testified that during that call, Mr. McKnight explained that the position would require Mr. Lamb to work in person at INL during "a three-month acclimation period," but that after that period he "would be able to work remotely" if he chose to do so.[1] *Id.* at 152:24–153:7. Mr. Lamb testified that Mr. McKnight also represented that the job was for a one-year term. *See id.* at 159:7–12.

13. Mr. Lamb testified that Mr. McKnight then requested a copy of Mr. Lamb's resume, and the two of them had a follow-up conversation two days later in which Mr. Lamb expressed his salary expectations. *See id.* at 157:12–24. Mr. Lamb testified that Mr. McKnight told him that the salary he had requested "seemed doable," but that Mr. McKnight could not confirm this until Mr. Lamb was formally selected for the position. *Id.* at 157:25–158:4.

14. Mr. Ott testified that GreenFoot did not require Mr. Lamb or Mr. McKnight to complete any paperwork regarding these discussions. *See id.* at 76:24–77:1.

---

[1] Because Mr. McKnight did not testify in this case, Headcount argues that any evidence of Mr. McKnight's statements to Mr. Lamb is inadmissible hearsay. *See* Tr. at 8:7–24. Plaintiff argues that these statements are admissible under Federal Rule of Evidence 801(D)(2) because Mr. McKnight was acting as Headcount's agent when he made them. *See id.* at 14:2–19. For the reasons explained later, the court does not resolve this issue.

15.     Five days later, Mr. Lamb interviewed with INL staff. He testified that Mr. McKnight called him four days later to offer him the position formally.

16.     On January 30, 2018, Mr. Lamb sent an email to Mr. McKnight stating that he was "thrilled" to "formally accept" the "job offer." Pl. Ex. 24. His email included the following passage:

> I will need confirmation on my start date and starting salary, but based on our discussion, it will be February 12, 2018, with an annual salary of $87,500. I will need to gather some more information as far as health, dental, and vision benefits. Please let me know if there is any paperwork or additional information you need from me beforehand, or if there is any documentation I should bring along on my first day. Also let me know if there's anything I need to sign for you prior to my start date.

*Id.*

17.     The next day, Headcount prepared a "New Hire Form" relating to Mr. Lamb's position. *See* Pl. Ex. 25. The form includes three classes of information: (1) "Employee Information," (2) "Recruiter Information," and (3) "Client/Supervisor Information." *Id.* Mr. Lamb's personal information is listed under "Employee Information" along with a "start date" of February 12, 2018, a "pay rate" of $43.00 per hour, a "bill rate" of $85.00 per hour, and a designation as a "W9 Contractor." *Id.* The "client" is identified as INL, and Mr. Lamb's supervisor is listed as James Lively. *See id.* Mr. McKnight is identified as a "recruiter" from GreenFoot. *Id.* The form is signed and dated by Mr. McKnight alone, *see id.*, and the parties did not introduce any evidence showing that Mr. Lamb ever saw this document. Nor have they introduced any evidence of a written employment contract between Mr. Lamb and Headcount.

18.     Mr. Lamb did testify that "as soon as" he accepted the position, Mr. McKnight "more or less handed everything off" to Headcount, informing him that Headcount would be his employer of record, that "all of [his] pay stubs, everything, would be referencing Headcount," and that he "would be working with them from that point on." Tr. at 159:15–20.

5

19. Mr. Lamb resigned from his then-current position as an employee for BAE Systems, Inc., on February 9, 2018. *See* Pl. Ex. 2; Tr. at 163:24–164:17.

20. On February 12, 2018, Mr. Lamb reported for his first day of work at the INL facility in Idaho Falls, Idaho. *See* Tr. at 167:8–11. But he was informed by Carl Fennen, one of the managers at the facility, that he would be unable to start working that day because of "contractual hiccups." *Id.* at 167:18–24. Because Mr. Lamb was not given a timeline for when these issues would be resolved, he decided to stay in Idaho Falls for five days "to avoid the back and forth" that might result if he returned to Utah during the work week. *Id.* at 169:3–8. Mr. Lamb was not cleared to begin working at INL until February 21, 2018. *See id.* at 169:12–13.

21. In his post-trial brief, Mr. Lamb maintains that he incurred costs for gasoline, food, and lodging during the nine days between when he was supposed to start work and when he was actually able to do so.

22. At trial, Mr. Lamb submitted bank statements with various highlighted charges totaling $393.21. *See* Pl. Ex. 34 at 3, 13–14; Pl. Ex. 35 at 6–7. In his post-trial briefing, he represents that these charges reflect the gasoline and food expenses that he incurred because of his delayed start date. Although the bank statements do show that Mr. Lamb incurred various charges, they are not receipts and thus do not indicate what Mr. Lamb actually purchased. For example, one of the highlighted charges is for $44.24 spent on February 8, 2018, at Tony Davino Toyota in Riverdale Utah, *see* Pl. Ex. 34 at 12, and another is for $7.00 spent at the Hitt Road Car Wash in Idaho Falls, Idaho on February 21, 2018, *see* Pl. Ex. 35 at 7. Aside from these charges that do not appear on their face to relate to gasoline or food, all that the court can determine from the other highlighted charges is how much was spent and that they were all incurred at gas stations, food establishments, convenience stores, or Wal-Marts. As a result, the

court finds that it cannot determine what many of the expenses are, whether they were reasonably necessary, or what portion of them is fairly attributable to the nine-day delay in Mr. Lamb's starting date.

**23.** Mr. Lamb's credit card statements show that he also incurred an Airbnb charge of $713.34 on February 2, 2018. *See* Pl. Ex. 40 at 24. Presumably at least part of this charge covered Mr. Lamb's lodging for the days that Mr. Lamb was in Idaho Falls but unable to work, though nothing in the record explicitly confirms this or indicates how many days the charge covered. Mr. Lamb does not appear to have incurred another Airbnb charge until March 9, 2018, however, which strongly suggests that the February charge covered a much longer period than the nine days that Mr. Lamb's start date was delayed. The court thus finds that Mr. Lamb has provided no basis for determining what portion of the February 2nd Airbnb charge is fairly attributable to the nine days he was unable to work.

**24.** As soon as Mr. Lamb started working, he expressed concern whether INL would in fact allow him to work from home after he completed an initial three months in person at INL—raising the issue to Mr. McKnight that same day. *See* Pl. Ex. 55 at 10. He raised the same concern again on April 11th, 12th, and 18th. *See id.* at 13–14.

**25.** On May 24, 2018 (almost exactly three months after he began working at INL), Mr. Lamb stopped commuting to the INL facility and began working exclusively from home. *See* Tr. at 182: 4–12.

**26.** On July 21, 2018, Mr. Lamb had difficulty logging in to INL's network and shortly thereafter received a call from Mr. Ott informing him that INL had canceled the contract covering Mr. Lamb's position and that his employment with Headcount was accordingly

terminated as of that day. *See id.* at 182:4–18. INL did not provide Mr. Lamb with a reason for its decision at that time. *See id.* at 183:15–20.

27. Two days after Mr. Lamb was terminated, he texted Mr. Ott to ask whether INL could cancel his contract without notice. *See* Pl. Ex. 56 at 2. Mr. Ott told Mr. Lamb that he did not know, but that "every contract is an at will agreement" and that "[e]ither side can amend it at any time for any reason." *Id*. Although Mr. Ott stated that he had not yet spoken to anyone at INL, he told Mr. Lamb that he "d[id] not believe" that INL canceled the contract because of Mr. Lamb's performance. *Id.*

28. Mr. Lamb also called Mark Arrow, Headcount's president, shortly after his termination. *See* Tr. at 143:11–24. Mr. Arrow testified that, during the call, he told Mr. Lamb that he had "no idea what's going on," but that he would "look into it." *Id.* at 143:25–144:6. Mr. Arrow testified that he subsequently learned that Mr. Lamb had left the facility with a government computer without approval for remote work and that, as a result, INL was "afraid" that he may have been "selling secrets" or could otherwise cause "a breach." *Id.* at 144:13–21.

29. Mr. Ott testified that Jim Lively from INL contacted him about a month or two after Mr. Lamb was terminated and informed him that INL had terminated the contract for Mr. Lamb's assignment early because it was "displeased with Mr. Lamb's performance." *Id.* at 88:11–14. Specifically, Mr. Ott testified that Mr. Lively told him that INL "could not validate" when Mr. Lamb was logged on for work, or for how long, and thus "could not determine that he was logged in working the hours" he was required to work. *Id.* at 85:21–86:3.

30. Mr. Lamb testified that he did not receive any feedback about his performance until after he "decided to seek legal action." *Id.* at 183:17–20.

31. Mr. Lamb received $42,091 in salary payments from Headcount between March 2, 2018, and August 3, 2018. *See* Pl. Ex. 9. No deductions from his salary for health insurance or other benefits were reflected on any of Mr. Lamb's earnings statements that were admitted into evidence. *See id.*

32. In August 2018, Mr. Lamb received roughly $810 for two weeks of construction work. *See* Tr. at 207:17–23; Pl. Ex. 34 at 55.

33. On August 22, 2018, the Utah Department of Workforce Services determined that Mr. Lamb was not at fault for his discharge from work. *See* Pl. Ex. 12. As a result, he received $4,344 in unemployment benefits for the period between July 21, 2018, and September 23, 2018. *See* Pl. Ex. 43 at 1; Tr. at 266:20–25.

34. On October 1, 2018, Mr. Lamb began working for Booz, Allen, & Hamilton as an Information Technology Subject Matter Expert, receiving a monthly salary of $7,500. *See id.* at 266:14–19; Pl. Ex. 37 at 2–4, 9–10.

35. In the period between when Mr. Lamb was terminated from Headcount on July 21, 2018, and when he received his first paycheck from Booz, Allen & Hamilton, Mr. Lamb received interest-free loans from his father-in-law totaling $6,000. *See* Tr. at 209:25–210:25. Mr. Lamb paid that money back in full on November 6, 2018. *See id.*; Pl. Ex. 34 at 78. He also received financial assistance from his church, which paid at least some of his gas and electricity bills during that time. *See* Tr. at 205:18–206:8. Mr. Lamb offered no evidence that he was required to repay his church for any of that assistance.

36. In April 2019, Mr. Lamb received an $8,000 severance payment from INL as a settlement for potential claims against INL. *See* Tr. at 243:2–6.

**CONCLUSIONS OF LAW**

The court will first address Mr. Lamb's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. It will then turn to his claims for fraudulent and negligent misrepresentation.

**I.**

In its summary judgment ruling, the court concluded that Mr. McKnight acted as Headcount's agent when he recruited Mr. Lamb for the position at INL and thus had authority to form a valid employment contract with Mr. Lamb that would bind Headcount as Mr. Lamb's employer of record. *See* Summ. J. Hr'g Tr., Dkt. No. 61 at 29:16–19. Headcount has asked the court to reconsider this ruling in light of the evidence presented at trial, *see* Tr. at 10:20–11:13, and after the close of evidence the court urged the parties to address in their post-trial briefing whether Mr. McKnight had authority to bind Headcount or whether Headcount could otherwise be held liable to Mr. Lamb based on Mr. McKnight's representations, *see id.* at 274:12–275:1. Ultimately the court need not decide whether to reconsider its summary judgment ruling or whether Mr. McKnight acted as Headcount's agent because it concludes that Mr. Lamb has failed to demonstrate that he suffered damages net of mitigation as a result of Headcount's alleged breach of contract and the implied covenant of good faith and fair dealing.

A breach of contract claim has four elements: "'(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages.'" *Richards v. Cook*, 314 P.3d 1040, 1043 (Utah Ct. App. 2013) (quoting *Bair v. Axiom Design, LLC*, 20 P.3d 388, 392 (Utah 2001)).[2] A claim for breach of the implied covenant of good faith

---

[2] Both parties' briefs reflect the assumption that Utah law governs Mr. Lamb's claims. The court will thus apply Utah law to these claims, consistent with the parties' assumptions.

10

and fair dealing likewise requires a showing of damages: because "the implied covenant is simply a term of the contract like any other, a violation of the covenant is a breach of contract and gives rise to a claim for breach of contract." *Mountain Courtyard Suites v. Wysong*, 452 F. Supp. 3d 1275, 1282 (D. Utah 2020) (cleaned up).

Generally speaking, Utah law allows recovery of two types of damages for a breach of contract: "general damages, which flow naturally from the breach, and consequential damages, which, while not an invariable result of breach, were reasonably foreseeable by the parties at the time the contract was entered into." *Mahmood v. Ross*, 990 P.2d 933, 937 (Utah 1999) (cleaned up).[3] A plaintiff must prove both the fact and the amount of damages. *See Atkin Wright & Miles v. Mountain States Tel. and Tel. Co.*, 709 P.2d 330, 336 (Utah 1985).

Based on his conversations and email correspondence with Mr. McKnight, Mr. Lamb contends that he was promised a salary of $87,500 for a one-year period starting on February 12, 2018. *See* Findings of Fact ¶¶ 12, 16. The evidence admitted at trial shows that he received $42,091 in salary from Headcount before he was terminated. *See id.* ¶ 31. In the period between his termination and February 11, 2019, Mr. Lamb received $4,344 in unemployment benefits, $810 for construction work, $8,000 as a settlement from INL, and $32,668.13 in salary from his new job with Booz Allen.[4] *See id.* ¶¶ 32–34, 36. He thus received a total of $87,913.13 during

---

[3] Noneconomic damages are allowed in a breach of contract action "where the specific language and nature of the contract demonstrates that such damages were contemplated." *Gregory & Swapp, PLLC v. Kranendonk*, 424 P.3d 897, 905 (Utah 2018) (citation omitted). Because Mr. Lamb has offered no evidence that the purported oral contract at issue here contemplated noneconomic damages, he has not shown that he is entitled to this form of relief.

[4] The court has calculated Mr. Lamb's salary from Booz Allen by combining his salary for October through January with a portion of his February salary, which the court has prorated using federal standards for calculating workweeks, with October 1, 2018 as Mr. Lamb's starting date. *See* 29 C.F.R. § 778.105. Mr. Lamb's salary for the month of February could also be prorated based on the proportion of calendar days (11 out of 28) or working days (7 out of 20) that had elapsed by February 11, 2019. Using the proportion of calendar days produces a total

the one-year period beginning on February 12, 2018. The court has not included the financial assistance Mr. Lamb received from his church during this period, though it would probably make sense to do so absent any evidence that Mr. Lamb was required to repay the church for this assistance. It follows that Mr. Lamb did not suffer *any* general damages as a result of the claimed breach. To the contrary, apart from any consequential damages, he received a net economic *benefit* as a result of his termination.[5]

As for consequential damages, Mr. Lamb produced bank and credit card statements showing that he incurred various charges that he maintains represent the cost of food, gas, and lodging that he incurred between his promised start date and his actual start date. *See id.* ¶¶ 22–23. For all of these charges, the court has found that the evidence admitted at trial does not establish what expenses Mr. Lamb incurred that were both reasonably necessary and fairly attributable to the nine-day delay in his start date. *See id.*

Mr. Lamb also claims that he did not receive medical benefits for over 60 days despite paying weekly contributions of $205.99 from the start of his employment. His pay stubs, however, reflect no such contributions. *See id.* ¶ 31. And his email accepting Mr. McKnight's offer of employment makes clear that the parties had not yet reached an agreement regarding "health, dental, and vision benefits." *Id.* ¶ 16.

---

Booz Allen salary of $32,946.43; using the proportion of working days produces a salary of $32,625.

[5] Although Utah law applies the "collateral source rule" in tort cases, which provides that "a wrongdoer is not entitled to have damages, for which he is liable, reduced by proof that the plaintiff has received or will receive compensation or indemnity for the loss from an independent collateral source," *Pioneer Builders Co., Inc. v. KDA Corp.*, 292 P.3d 672, 693 (Utah 2012) (quotation omitted), Mr. Lamb has not provided—and the court has not identified—any Utah cases applying this rule in to breach of contract suits. In all events, because Mr. Lamb has not argued that the collateral source rule applies, he has waived any such argument.

Finally, Mr. Lamb argues that Headcount failed to provide him overtime hours to make up for his late start date. The only evidence offered at trial on this point was Mr. Lamb's testimony that Mr. Fennen told him that INL "would allot [him] overtime" that he "would be authorized to use . . . due to the start date." Tr. at 171:18–21. But Mr. Lamb has offered no evidence or argument that would support a conclusion that Mr. Fennen—a manager *for INL*—had authority to modify Headcount's contract with Mr. Lamb or to bind Headcount to any agreement he may have reached with Mr. Lamb.

All told, Mr. Lamb has failed to carry his burden of showing that he suffered any net contract damages as a result of Headcount's breach. *Cf. Atkins*, 709 P.2d at 336. The court accordingly will enter judgment in Headcount's favor on Mr. Lamb's claims for breach of contract and the implied covenant of good faith and fair dealing.

## II.

The court next turns to Mr. Lamb's claims that Mr. McKnight made fraudulent or negligent misrepresentations both before and after Mr. Lamb formally accepted his job with Headcount.

The Master Service Agreement between Headcount and GreenFoot provides that GreenFoot is an independent contractor. *See* Findings of Fact ¶ 7. And the Utah Supreme Court has explained that one who engages the services of an independent contractor is generally not liable for the tortious acts or omissions of that independent contractor. *See Magana v. Dave Roth Constr.* 215 P.3d 143, 148 (Utah 2009); *Thompson v. Jess*, 979 P.2d 322, 325 (Utah 1999). Mr. Lamb argues that Headcount is nevertheless liable for Mr. GreenFoot's torts under the "retained control doctrine." *See* Pl. Proposed Findings & Conclusions, Dkt. No. 77 at 15–18.

While the Utah Supreme Court has recognized this doctrine, *see Magana*, 215 P.3d at 148, it has explained that it "applies narrowly in unique circumstances"—only where one who engages the services of an independent contractor "exerts such control over the means utilized that the contractor cannot carry out the injury-causing aspect of the work in his or her own way." *Id.* at 148, 150 (cleaned up). And although the Utah Supreme Court has held that "contractual provisions may create sufficient control for a contracting party to retain control over the other party," *Boynton v. Kennecott Utah Copper, LLC*, 500 P.3d 847, 864 (Utah 2021), that is not the case here because Headcount did not retain control over Mr. McKnight's recruiting conduct through any contractual provision.

The Master Service Agreement provided that GreenFoot's role was to "source, screen and otherwise identify candidates to satisfy the requirements of its customers," and Headcount's president testified at trial that Headcount had "nothing to do with the actual finding of candidates." Findings of Fact ¶ 4. While Headcount agreed to employ the candidates GreenFoot identified, Headcount played *no* role in finding those candidates. *See id.* Indeed, the only instructions that Headcount could be said to have given to GreenFoot relating to the means through which it recruited employees for Headcount was that GreenFoot—and therefore Mr. McKnight—were prohibited from "represent[ing] or imply[ing]" that they had "the power, to obligate [Headcount] to any expenses other than those expressly agreed to in writing." *Id.* ¶ 7.

The purportedly tortious conduct in this case arises exclusively out of statements made by Mr. McKnight without prior written approval from Headcount. *See id.* ¶¶ 10–16. It thus cannot be said that Headcount, through this agreement, exercised sufficient control over "the injury-causing aspect" of Mr. McKnight's work to give rise to a duty of care under the retained control doctrine. Rather, to the extent that Headcount exercised *any* control over Mr. McKnight's injury-

causing conduct, it was to limit the kinds of representations and promises Mr. McKnight could make when acting on Headcount's behalf.

The court will therefore enter judgment for Headcount on Mr. Lamb's claims for fraudulent and negligent misrepresentation.[6]

\*   \*   \*

For the foregoing reasons, the court will enter judgment in Headcount's favor on all of Mr. Lamb's claims.

**IT IS SO ORDERED.**

DATED this 29th day of July, 2022.

BY THE COURT:

_____

Howard C. Nielson, Jr.
United States District Judge

---

[6] As noted, at the close of evidence, the court urged the parties to address the legal basis for holding Headcount liable for Mr. McKnight's conduct in their post-trial briefs. The only legal basis Mr. Lamb offered for holding Headcount liable for Mr. McKnight's tortious conduct in his post-trial briefing was the retained control doctrine. The court accordingly concludes that Mr. Lamb has waived reliance on any other legal basis for holding Headcount liable in tort for any fraudulent or negligent misrepresentations made by Mr. McKnight.